IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,

*Plaintiff,*

v.

MONTEL SMITH,

*Defendant.*

Criminal No. 2:23-cr-00008

Hon. William S. Stickman IV

## **MEMORANDUM OPINION**

WILLIAM S. STICKMAN IV, United States District Judge

By Indictment filed on January 10, 2023, Defendant Montel Smith ("Smith") was charged as follows at Count One, in violation of 18 U.S.C. § 922(g)(1):

> On or about December 22, 2022, in the Western District of Pennsylvania, the defendant, MONTEL SMITH, knowing he had previously been convicted of a crime punishable by imprisonment for a term exceeding one year, namely, possession with intent to deliver a controlled substance, on or about October 2, 2014, at Docket Number CP-02-CR-5425-2014 in the Court of Common Pleas, County of Allegheny, Criminal Division, Commonwealth of Pennsylvania, knowingly possessed, in and affecting interstate commerce, a firearm and ammunition, to wit: a .45 caliber semi-automatic Century Arms pistol, bearing serial number GI10662, and Winchester .45 caliber ammunition.

(ECF No. 18, p. 1). The Government has represented as to Smith's prior conviction:

> On October 2, 2014, Smith was convicted of felony Possession with Intent to Deliver Heroin, a Schedule I controlled substance, and felony Conspiracy to commit the same. The charges came after Smith and his codefendant were approached for smoking marijuana. Police executed a search of the apartment the defendant was in and recovered multiple bags of marijuana, 29 stamp bags of heroin, a digital scale, and large amount of currency. The defendant was sentenced to 3 years' probation.

(ECF No. 51, p. 3). Smith has filed a Motion to Dismiss Indictment in the wake of *Range v. Attorney General*, 69 F.4th 96 (3d Cir. 2023) arguing that § 922(g)(1) is unconstitutional as

applied to him as well as unconstitutionally vague and in violation of the Commerce Clause. (ECF No. 44). The Government opposes the motion. For the following reasons, the Court will deny Smith's motion.

## I.    STANDARD OF REVIEW

The Federal Rules of Criminal Procedure require that an indictment be a plain, concise, and definite written statement of the essential facts constituting the offense charged. Fed. R. Crim. P. 7(c)(1). An indictment is sufficient if it includes the elements of the offense intended to be charged, apprises the defendant of what he must be prepared to defend against at trial, and enables him to plead a former acquittal or conviction in the event of a subsequent prosecution. *United States v. Rawlins*, 606 F.3d 73, 78-79 (3d Cir. 2010); *United States v. Vitillo*, 490 F.3d 314, 321 (3d Cir. 2007). An indictment that fails to charge all elements of a crime must be dismissed. *United States v. Cochran*, 17 F.3d 56, 57 (3d Cir. 1994).

A motion to dismiss an indictment is governed by Rule 12 of the Federal Rules of Criminal Procedure ("Rule 12") which states: "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1).

> [T]he scope of a district court's review at the Rule 12 stage is limited. "[A] pretrial motion to dismiss an indictment is not a permissible vehicle for addressing the sufficiency of the government's evidence." *United States v. DeLaurentis*, 230 F.3d 659, 660 (3d Cir. 2000) (citations omitted). "The government is entitled to marshal and present its evidence at trial, and have its sufficiency tested by a motion for acquittal pursuant to Federal Rule of Criminal Procedure 29." *Id.* at 661. There is no criminal corollary to the civil summary judgment mechanism. *Id.* In evaluating a Rule 12 motion to dismiss, a district court must accept as true the factual allegations set forth in the indictment. *United States v. Sampson*, 371 U.S. 75, 78–79, 83 S.Ct. 173, 9 L.Ed.2d 136 (1962); *United States v. Besmajian*, 910 F.2d 1153, 1154 (3d Cir. 1990). "Evidentiary questions—such as credibility determinations and the weighing of proof—should not be determined at this stage." *Bergrin*, 650 F.3d at 265 (internal marks and citation omitted). Thus, a district court's review of the facts set forth

> in the indictment is limited to determining whether, assuming all of those facts as
> true, a jury could find that the defendant committed the offense for which he was
> charged. *Panarella*, 277 F.3d at 685; *DeLaurentis*, 230 F.3d at 660.

*United States v. Huet*, 665 F.3d 588, 595-96 (3d Cir. 2012), *abrogated on other grounds*.  Under

Rule 12, the Court can dismiss criminal charges in an indictment where there is an infirmity of

law in the prosecution, such as an unconstitutional statute.

## II.   ANALYSIS

### A.  18 U.S.C. § 922(g)(1) is constitutional on its face and as applied to Smith.

Smith contends that recent developments in Second Amendment jurisprudence require

that the Court declare 18 U.S.C. § 922(g)(1) unconstitutional. The Court disagrees; it will not

declare § 922(g)(1) unconstitutional on its face or as applied to Smith.

The Second Amendment provides that "[a] well regulated Militia, being necessary to the

security of a free State, the right of people to keep and bear Arms, shall not be infringed." U.S.

Const. amend. II.   In 2008, the Supreme Court held that, "on the basis of both text and history,"

the Second Amendment protects *an individual's* right to keep and bear arms.  *District of*

*Columbia v. Heller*, 554 U.S. 570, 595 (2008).  The Supreme Court made clear, however, that

"[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Id.* at 626.

Relevant to the instant motion, the Supreme Court stated:

> Although we do not undertake an exhaustive historical analysis today of the full
> scope of the Second Amendment, nothing in our opinion should be taken to cast
> doubt on longstanding prohibitions on the possession of firearms by felons and
> the mentally ill, or laws forbidding the carrying of firearms in sensitive places
> such as schools and government buildings, or laws imposing conditions and
> qualifications on the commercial sale of arms.

*Id.* at 625-27.  It further noted that "these presumptively lawful regulatory measures" were only

examples and not an exhaustive list.  *Id.* at 627 n.26.  "[T]here will be time enough to expound

3

upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us." *Id.* at 635.

In June 2010, the Supreme Court held that the Second Amendment right, elucidated in *Heller*, is incorporated against the states. *See McDonald v. City of Chicago*¸ 561 U.S. 742, 750 (2010). More specifically, it held that the "the right to keep and bear arms for the purpose of self-defense" in the home recognized by the Second Amendment "is fully applicable to the states." *Id.* The Supreme Court reiterated its observations in *Heller*, 554 U.S. at 626, that the right protected by the Second Amendment (like the rights protected elsewhere in the Constitution) is not unlimited and stated plainly: "We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill,' 'laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.' We repeat those assurances here." *McDonald*, 561 U.S. at 786 (quoting *Heller*, 544 U.S. at 626-27). "[I]ncorporation does not imperil every law regulating firearms." *Id.*

In 2022, the Supreme Court articulated an approach to addressing challenges invoking the Second Amendment in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. ——, 142 S. Ct. 2111 (2022). It rejected the kinds of tests developed by the courts of appeal which employed a "means-end" scrutiny. *Id.* at 2126–27. In their place, the Supreme Court articulated a new test:

> In keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's

> historical tradition may a court conclude that the individual's conduct falls outside
> the Second Amendment's 'unqualified command.'

*Id.* at 2126 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50, n.10 (1961)). *Bruen* does not explicitly address the propriety of firearm possession bans for persons previously convicted of a felony crime; however, it refers to those falling under the protection of the Second Amendment as "law abiding" people. Thus, *Bruen* does not upset the Supreme Court's consistent endorsement of felon disarmament. The Supreme Court explicitly stated that it is "[i]n keeping with *Heller*." *Id.*

Since then, the United States Court of Appeals for the Third Circuit directly applied *Bruen* in *Range v. Attorney General United States of America*, 69 F.4th 96 (3d Cir. 2023) (*en banc*). The Third Circuit evaluated an as-applied challenge under *Bruen* to the prohibition on felons possessing guns in § 922(g)(1). Range pleaded guilty in 1995 to making a false statement to obtain food stamps. *Id.* at 98. At the time he pleaded guilty, his conviction was considered a misdemeanor punishable by up to five years' imprisonment. *Id.* But his conviction precluded him from possessing a firearm under § 922(g)(1). *Id.* To reemphasize – Range was not a felon; he committed a nonviolent misdemeanor offense relating to false statements on paperwork for public benefits. Range wanted to possess a hunting rifle and a shotgun for home defense, so he sought a declaration that § 922(g)(1) violates the Second Amendment as applied to him. *Id.* at 99.

The Third Circuit applied the *Bruen* analysis and ruled in Range's favor. After determining that Range was one of "the people" to whom the Second Amendment applies, and his proposed conduct (owning a hunting rifle) was protected by the Second Amendment, the Third Circuit then asked whether the government carried its burden to justify stripping Range of that right. In order to justify § 922(g)(1), as it applied to Range, the government needed to show

that the statute was "consistent with the Nation's historical tradition of firearm regulation." *Id.*
(quoting *Bruen*, 142 S. Ct. at 2130). Ultimately, the Third Circuit determined that the
government had not met its burden because a review of sources from the founding era and early
Republic do not reveal that the disarmament of people like Range was practiced or contemplated.
Rather, a review of those sources demonstrated that at the time of the ratification of the Second
Amendment, disarmament was limited to individuals who were viewed as dangerous to the
community. *Id.* at 103–04. In other words, the Third Circuit held that the government failed to
show that the historical tradition of firearms regulation would have deprived Range of his
Second Amendment right to possess a firearm in light of his conviction for making false
statements on an application for public benefits. *Id.* at 106.

Notably, the Third Circuit emphasized that its decision in *Range* "is a narrow one." *Id.* at
106. It did not invalidate § 922(g)(1). As Judge Ambro stated in a concurrence joined by two
other judges, § 922(g)(1) "remains. . . because it fits within our Nation's history and tradition of
disarming those persons who legislature believe would, if armed, pose a threat to the orderly
functioning of society." *Id.* at 110 (citations omitted).

As to Smith's facial challenge to § 922(g)(1), *Bruen* does not upset the Supreme Court's
consistent endorsement of felon disarmament.[1] The distinction drawn by the majority opinion in
*Range* between violent and nonviolent felons does not help Smith. In *Range*, the Third Circuit
did not hold that § 922(g)(1) is unconstitutional in all circumstances, as necessary to succeed in a
facial challenge. *See United States v. Mitchell*, 652 F.3d 387, 405 (3d Cir. 2011) (*en banc*)

---

[1] The Court does not consider extensive historical discussion essential to resolving Smith's
argument that § 922(g)(1) is unconstitutional under *Bruen*. There is overwhelming precedent
upholding the constitutionality of restrictions on the possession of firearms by felons and there is
no need for the Court to conduct an in-depth analysis of whether the felon-in-possession statute
is consistent with the historical tradition of firearm regulation.

(citation omitted) ("A party asserting a facial challenge 'must establish that no set of circumstances exists under which the Act would be valid.'").   In fact, the majority opinion recognized that the statute is constitutional when applied to violent felons.  *Range*, 69 F.4th at 104.  The Third Circuit, in *Range*, did not find § 922(g)(1) facially unconstitutional.  Here, Smith has not demonstrated that § 922(g)(1) violates the Second Amendment in all applications. Smith's facial challenge fails.

As to Smith's "as applied" challenge, it too fails.  Applying the *Bruen* framework to this case, the threshold question is whether Smith is one of "the people" protected by the Second Amendment despite having prior felony convictions.  *Range*, 69 F.4th at 101.  In *Range*, the Third Circuit majority held that "the people" in the constitutional text refers to all Americans and not only law-abiding persons.  *Id.*  The Third Circuit agreed with a statement of then-Judge Amy Coney Barrett that "'all people have the right to keep and bear arms,' though the legislature may constitutionally 'strip certain groups of that right.'"  *Id.* at 102 (quoting *Kanter v. Barr*, 919 F.3d 437, 452 (7th Cir. 2019) (Barrett, J., dissenting)).  Accordingly, as the Government concedes (ECF No. 51, p. 7), Smith is one of "the people" protected by the Second Amendment.

Having determined that Smith is one of "the people," the next question is whether "'the Second Amendment's plain text covers [Smith's] conduct,' and 'the Constitution presumptively protects that conduct.'"  *Range*, 69 F.4th at 103 (quoting *Bruen*, 142 S. Ct. at 2126).  The Third Circuit in *Range* considered the defendant's underlying offense of conviction.  Smith, unlike Range, was in possession of a <u>stolen</u> firearm.  As the Government accurately notes, "Smith has not alleged that he owned the gun in question, that he had permission to use it, or that the gun was not stolen (or even that he did not believe it was stolen) – let alone come forward with any evidence of such facts."  (ECF No. 51, p. 7).  The Court concurs with the Government that "a

stolen firearm is not typically possessed by law-abiding citizens for lawful purposes" (*Id.* at 8),

and that possession of it lies outside of the Second Amendment's right to keep and bear arms.

Furthermore, § 922(g)(1)'s ban on firearm possession by persons, like Smith, who have

been convicted of drug trafficking is consistent with our country's historic tradition of regulating

firearms.  While, as *Range* observed, there is no historical tradition from the colonial era or early

Republic categorically disarming those merely convicted of crimes (particularly, crimes relating

to the sort of conduct that Range committed), there is a long history of disarming people who

pose a danger to society.   As early as the seventh century, English law permitted the

disarmament of violent and dangerous people.     Joseph G.S. Greenlee, *The Historical

Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249,

258 (2020) (citing Ancient Laws and Institutes of England 3 (Benjamin Thorpe ed., 1840)

(describing the Laws of King Aethelbirht as banning the provision of arms to another "where

there is strife").  A millennium later, in the seventeenth century, King Charles II ordered the

Lord Mayor of London to disarm "dangerous and disaffected persons."  *Id.* at 259 (citing 10

Calendar of State Papers, Domestic Series, Domestic Series of the Reign of Charles II, 1660-

1670 237 (1895)).  This included Catholics who, following the failed gunpowder plot, were

viewed as disloyal and potentially dangerous.  *Id.* at 258 (citing 1 Stuart Royal Proclamations:

Royal Proclamations of King James I 1603-1625, 247-48 (June 2, 1610) (James F. Larkin & Paul

I. Hughes eds., 1973)).

Colonial laws mirrored English models and similarly disarmed those persons viewed as

a danger to public order, including American Indians, Catholics, Quakers, slaves, and freed

Black people.   There is no question that such laws imposing discriminatory class-wide

disarmament would, thankfully, fail constitutional scrutiny under modern standards.

Nevertheless, they demonstrate that at the time of the founding, the American colonists were accustomed to laws depriving people posing a threat to society (as they viewed it) from possessing arms. Colonial laws also disarmed those whose actions made them a danger to the community. Laws passed in Massachusetts Bay and New Hampshire forbade the carrying of arms "in an aggressive and terrifying manner." *Id.* at 262. Likewise, Virginia allowed the disarmament of those "who ride, or go, offensively armed, in Terror of the People." *Id.* at 262 (citing George Webb, The Office of Authority of a Justice of the Peace 92-93 (1736)).

At the time of the ratification of the Second Amendment, alongside the several states' declarations of rights, the framers and the people understood that the right to keep and bear arms extended to all "peaceable" citizens. Wyoming LR at 266 (citing 2 BERNARD SCHWARTZ, THE BILL OF RIGHTS: A DOCUMENTARY HISTORY 675 (1971)); *see also* Stephen Halbrook, THAT EVERY MAN BE ARMED 86 (revised ed. 2013) ("[T]he Second Amendment…originated in part from Samuel Adams's proposal…that Congress could not disarm any peaceable citizens."). Samuel Johnson's dictionary from the time of ratification defined "peaceable" as "1. Free from war; free from tumult. 2. Quiet; undisturbed; 3. Not violent; not bloody; 4. Not quarrelsome; not turbulent." 2 Samuel Johnson, A DICTIONARY OF THE ENGLISH LANGUAGE (5th ed. 1773).[2] The prevailing view that "peaceable" citizens were secure in their right to keep and bear arms excluded those who did not fall within that definition—those who were, conversely, dangerous. As Third Circuit Judge Thomas M. Hardiman's concurring opinion in *Binderup v. Att'y Gen. United States of America*, 836 F.3d 336, 368 (3d Cir. 2016) observed:

> [T]he debates from the Pennsylvania, Massachusetts and New Hampshire ratifying conventions, which were considered "highly influential" by the

---

[2]  Johnson's dictionary is an authoritative resource for the meaning of words as understood by the founding generation. The Supreme Court cited to it in *Heller* to interpret the language of the Second Amendment. *See Heller*, 554 U.S. at 582-84.

> Supreme Court in *Heller*…confirm that the common law right to keep and bear arms did not extend to those who were likely to commit violent offenses. Hence the best evidence we have indicates that the right to keep and bear arms was understood to exclude those who presented a danger to the public.

(internal citations omitted).

The disarming of people who pose a danger to society is deeply rooted in our country's legal traditions. While it is easy to categorize violent felons as dangerous, that label is not limited to people with a history of violent criminal conduct. The Court holds that, as historically understood, felons whose conviction(s) is/are related to dealing drugs are dangerous. They are not peaceable, as understood at the time of the framing or now. Indeed, even a cursory review of the dockets of state and federal courts, or the local newspaper, demonstrates that the drug trade is surrounded by an abundance of "tumult," leaves no segment of our society "quiet or undisturbed" and—especially when mixed with guns—is both "violent" and "bloody." Historic analogues and modern jurisprudence recognize that drug crimes pose a clear and present danger to our communities.

It is well recognized that guns and drugs "are a dangerous combination"—as courts across the country have consistently found. *Smith v. United States*, 508 U.S. 223, 240 (1993) ("When Congress enacted the current version of § 924(c)(1), it was no doubt aware that guns and drugs are a dangerous combination.... [They] create[ ] a grave possibility of violence and death[.]"). This connection is so powerful that Congress has sought not just to prohibit drug traffickers from possessing firearms after sustaining a felony trafficking conviction, but to also criminalize the mere possession of a firearm while trafficking controlled substances. 18 U.S.C. § 924(c)(1)(A). Congress additionally deemed that such an offense must be punished by a minimum of five years' imprisonment, consecutive to any sentence imposed for drug trafficking. *Id.* The Government correctly points out that "guns are well-accepted '"tools of the trade"' for

drug dealers, especially in large-scale transactions. ' *United States v. Bellitti*, 45 F. App'x 134, 136 (3d Cir. 2002) (quoting *United States v. Martinez*, 938 F.2d 1078, 1083-84 (10th Cir. 1991))." (ECF No. 51, p. 13)."

Modern laws prohibiting drug traffickers from possessing firearms align with the nation's historical tradition of firearm regulation. The goal of these regulations is to protect the public (law-abiding citizens) from disorder and violence. The danger of permitting drug traffickers to possess firearms is obvious. "The right to keep and bear arms always has been subject to careful limitations," which "are at their zenith when applied to people who are the antithesis of the law-abiding citizen who wants to exercise his or her right to self-defense, whether at home or in public, and who may also enjoy the various sports and other activities that involve guns." *Atkinson v. Garland*, 70 F.4th 1018, 1037 (7th Cir. 2023) (Wood, J., dissenting).

Holding § 922(g)(1) unconstitutional as applied to a defendant like Smith would strip Congress of its ability to protect the public from a clear and present danger. This is not something that the Court is willing to condone. It is consistent with the Supreme Court's observation in *Heller* and its progeny, as well as historical tradition, to deprive Smith of his right to possess a firearm. The prohibition on firearm possession by felons under § 922(g)(1) does not violate the Second Amendment, particularly as applied to Smith.

**B. 18 U.S.C. § 922(g)(1) is not unconstitutionally vague.**

Smith cannot mount a facial vagueness challenge to § 922(g)(1) without showing the statute is unconstitutional as applied to him, which he has failed to do. Nevertheless, the Court holds that § 922(g)(1) is not unconstitutionally vague.

There is a strong presumption that lawfully enacted statutes are valid. *I.N.S. v. Chadha*, 462 U.S. 919, 944 (1983). "The void-for-vagueness doctrine reflects the fundamental principle that, in order to comply with the requirements of due process, a statute must give fair warning of

the conduct that it prohibits." *United States. v. Portanova*, 961 F.3d 252, 262–63 (3d Cir. 2020) (quoting *United States v. Fontaine*, 697 F.3d 221, 226 (3d Cir. 2012)).  "A statute is unconstitutionally vague under the Due Process Clause if it (1) fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits; or (2) authorizes or even encourages arbitrary and discriminatory enforcement." *Fontaine*, 697 F.3d at 226 (internal quotation marks omitted) (citation omitted); *accord Johnson v. United States*, 576 U.S. 591, 595 (2015); *see also United States v. Williams*, 553 U.S. 285, 304 (2008)  (citation omitted) (noting that a criminal statute is unconstitutionally vague, and in violation of the Due Process Clause, if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement).

In  § 922(g)(1), Congress makes it unlawful for "any person— (1) who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year; ... to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce."  18 U.S.C. § 922(g)(1).  Smith can easily determine whether he is covered by this statute by examining his prior criminal convictions, and the statutory maximum prison terms for the crimes of conviction.  To convict Smith, the Government must prove four elements: (1) Smith was a felon; (2) Smith knew he was a felon; (3) Smith knowingly possessed a firearm or ammunition; and (4) the firearm or ammunition was in or affecting interstate commerce.  Section 922(g) requires proof that Smith "knew he belonged to the relevant category of persons barred from possessing a firearm," *Rehaif v. United States*, 139 S. Ct. 2191, 2200 (2019), and "the knowledge requirement of the statute further reduces any

potential for vagueness." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 21 (2010). For these reasons, the Court holds that § 922(g)(1) does not fail to provide "fair notice of what is prohibited," and is not unconstitutionally vague.

### C.  18 U.S.C. § 922(g)(1) does not violate the Commerce Clause.

In his last argument, Smith contends that § 922(g)(1) exceeds the power of the federal government under the Commerce Clause. He concedes that he is advancing this argument only to preserve it for future review. This is because Smith's argument is foreclosed by well-established precedent. The Commerce Clause authorizes Congress to regulate "the channels of interstate commerce, persons or things in interstate commerce, and those activities that substantially affect interstate commerce." *Nat. Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 536 (2012) (internal quotation marks omitted) (quoting *United States v. Morrison*, 529 U.S. 598, 609 (2000)). The problem addressed by § 922(g)(1) is the possession of firearms in interstate commerce by particular "channels of commerce"—those channels under the language of § 922(g)(1) being individuals with certain criminal convictions. The Supreme Court, in *Bruen*, did not overrule its decisions upholding Congress's power to regulate the possession of firearms in interstate commerce. *See Bruen*, 142 S. Ct. at 2162. The Third Circuit has affirmed that § 922(g)(1) was a proper exercise of Congress's regulatory power under the Commerce Clause. *See United States v. Singletary*, 268 F.3d 196, 204 (3d Cir. 2001); *United States v. Shambry*, 392 F.3d 631, 634 (3d Cir. 2004); *United States v. Gateward*, 84 F.3d 670, 672 (3d Cir. 1996); *see also Range*, 69 F.4th at 103-04.

### III.   CONCLUSION

For the foregoing reasons, Smith's Motion to Dismiss Indictment will be denied.   An Order of Court will follow.

BY THE COURT:

WILLIAM S. STICKMAN IV
UNITED STATES DISTRICT JUDGE

10-13-2023
Date